**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

**AFFIDAVIT IN SUPPORT OF THE SEIZURE OF $99,850.00 FROM HSBC ACCOUNT NUMBER 157734781**

**INTRODUCTION**

I, Jason Staab-Peters, being duly sworn, declare and state:

1. I am an "investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am a Special Agent (SA) of the United States Department of Justice (DOJ), Drug Enforcement Administration (DEA), in San Juan, Puerto Rico, and have been so employed since September of 2005.

2. Before employment with the DEA, I was employed as a Virginia Beach Police Department Vice and Narcotics Detective for six years. As a Virginia Beach Police Detective, I investigated over 200 narcotics violations, which resulted in arrests, and/or the seizure of U.S. currency, firearms and the seizure of powdered cocaine, cocaine base, marijuana, hashish, psilocybin, Oxycontin, methamphetamine, methylenedioxymethamphetamine (MDMA), lysergic acid diethylamide (LSD). Additionally, I authored and executed over 40 search warrants resulting in arrests, and/or narcotics and firearms seizures, and the seizure of currency. I have received specialized narcotics law enforcement training at the Drug Enforcement Administration Training Academy, Quantico, Virginia. During my employment with DEA, I have participated in the surveillance and investigation of numerous drug traffickers. I have debriefed numerous persons arrested for controlled substance trafficking and has debrief and directed confidential information in gathering controlled

1

substance intelligence. Also, I have spoken with experienced narcotics investigators concerning the method and practices of narcotics traffickers. Through my experience, training, and conversations with other investigators, I have also become familiar with the manner in which controlled substances are imported, manufactured, distributed and sold. More specifically, I have become familiar with the efforts of persons engaged in the importation, smuggling, manufacturing, distribution and sales of controlled substances to avoid detection and apprehension by law enforcement officers.

3. While employed by the DEA, I have participated in wiretap investigations concerning the unlawful importation of controlled substances, possession with intent to distribute controlled substances, distribution of controlled substances, the laundering of monetary instruments, monetary transactions in property derived from specified unlawful activities, and conspiracies associated with such violations.

4. I am currently assigned to the DEA Caribbean Division, Task Force I. During my law enforcement career, I have received detailed instruction in and conducted various complex conspiratorial investigations concerning the unlawful importation and distribution of controlled substances; the laundering and concealment of drug proceeds; and the illegal use of communication facilities by drug traffickers in furtherance of their criminal activities. A am aware that drug traffickers communicate with their drug trafficking associates utilizing cellular, residential and business telephones. I am also aware that drug traffickers often utilize coded language, frequently change their telephone numbers and discard their respective telephones in an effort to avoid law enforcement detection.

4. Through my own experience and training, I have become familiar with the methods of operation typically utilized by drug traffickers to hide or attempt to legitimize narcotic proceeds within third party bank accounts.

## BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

5. I make this affidavit, on information and belief derived from the following sources:

   A. Oral and or written reports and documents about this from other federal agents or officers of DEA.

   B. Physical surveillance conducted by the aforementioned law enforcement personnel, who either directly or indirectly, reported their observations to DEA.

   C. Debriefings of a Drug Enforcement Administration Confidential Source (CS).

6. Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by a Special Agent of the DEA. Unless otherwise noted, wherever in this affidavit I assert a statement was made, the information was provided by another law enforcement officer to whom I have spoken or whose report I have read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance, except where otherwise indicated, does not set forth my personal observation, but rather, has been provided to me directly or indirectly by other law enforcement officers who conducted such surveillance.

7. Since this affidavit is being submitted for the limited purpose of supporting the filing of the forfeiture civil complaint of HSBC account number 157734781, I have not set forth each and every fact learned during the course of this investigation.

8.     The TARGET SUBJECTS, violators, and others yet unknown, have committed, are committing, and will continue to commit the "drug offenses" and "money laundering offenses" described hence forth.

9.     During the course of this investigation agents have identified Target Subjects utilizing the Black Market Peso Exchange (BMPE). The BMPE is an underground financial system, used by drug trafficking organizations (DTOs) to evade reporting and record keeping requirements mandated by the Bank Secrecy Act as well as Colombian foreign exchange and import laws. During the course of the BMPE, DTOs export narcotics to the United States, where they are sold for US dollars. In Colombia a peso broker enters into a "contract" with the Colombian DTO and agrees to exchange pesos the broker controls in Colombia for US dollars the cartel controls in the US. Once the exchange occurs, the DTO has effectively laundered its money and is out of the BMPE process. At this time, the Colombian peso broker utilizes contacts within the United States to place narcotic proceeds that he (peso broker) purchased into the US banking system. Once the money has entered the US banking system the peso broker has a pool of narcotic proceeds within US financial institutions to "sell" to various legitimate Colombian business entities. Subsequently, Colombian importers place orders for goods from Asia and payments are made through the broker. Once the orders for goods have been placed the peso broker pays for the goods using financial transactions through US bank accounts and the purchased goods are smuggled or fraudulently entered into Colombia (avoiding import and exchange tariffs). The goods are sold and the Colombian importer pays the broker for the goods with Colombian pesos. The peso broker generates profits from fees to charge to DTOs and the importers for the illegal broker service.

10. Christian Camilo GOMEZ-Chavarro is a Colombian national, who is a peso broker for the LOCO BARRERA and COMBAS DTOs in Colombia. These DTOs produce multi-ton quantities of cocaine in Colombia that is subsequently distributed in North America and Europe. From or about June 1, 2010 to October 6, 2010, GOMEZ provided instructions to a DEA undercover agent (hereafter referred to as UC1) as to where to remit the monies to be laundered; that at times the instructions were set forth in electronic messages originating from the account sobrino.79@hotmail.com; that at times the instructions were issued verbally by GOMEZ; that the instructions always identified the accounts where the monies to be laundered would be deposited; and that the 18 accounts subject of the affidavit were all identified by GOMEZ in his instructions. From or about June 1, 2010 to October 6, 2010, GOMEZ laundered approximately $4,345,620.00 through 18 bank accounts, (hereinafter referred to as Target Accounts).

11. Based upon my review of various DEA intelligence documents and other law enforcement reports, along with financial statements and financial investigative reports, I believe the following Target Account was utilized by GOMEZ to launder funds derived from the production and trafficking of narcotics:

> **A. HSBC BANK**
> **2 S BISCAYNE BLVD, MIAMI, FL**
> **Account #: 157734781**
> **Beneficiary name: NEW CITY INC.**
> **21 SE 1ST AVENUE, 4TH FLOOR, MIAMI, FL**

12. On June 8, 2008, UC1 met with GOMEZ and Harold Darley PEREZ-Rolon in Isla Verde, PR. During this UC meet, PEREZ identified himself as the boss of GOMEZ. PEREZ stated that GOMEZ was representing him in Puerto Rico, and that he had several additional money

5

laundering contracts available in the future. Additionally, PEREZ stated that he had lost approximately 1.5 million dollars recently in Puerto Rico, which is why he sent GOMEZ to personally oversee money laundering transactions. During this meeting, GOMEZ stated that he could pay out these money laundering contracts anywhere in Colombia using a contact that he had in INTERBOLSA. In additional interaction with UC1, GOMEZ repeatedly stated that PEREZ was a cocaine trafficker and he (GOMEZ) was responsible for retrieving the proceeds from these drug transactions and finding a way to pay these monies out in Colombia.

13. Between June 14 and June 18, 2010, UC1 communicated on multiple occasions with GOMEZ. On June 15, 2010, GOMEZ sent an e-mail to UC1 using e-mail address sobrino.79@hotmail.com. In this e-mail, GOMEZ stated that he had 1000 kilograms of cocaine that would be sold for $4,200,000.00 and this money was from their "company." Agents believe that GOMEZ utilizes the term to "company" to represent "drug cartel." GOMEZ had previously informed UC1 that he works for the LOCO BARRERA and the COMBAS, Colombian based DTOs.

14. On or about August 12, 2010, GOMEZ negotiated a money laundering contract with a TF 1 UC agent. On August 12, 2010, while driving to meet a UC agent, a Puerto Rican Police Department (PRPD) officer conducted a stop of the vehicle GOMEZ was driving and subsequent to the vehicle stop; the officer developed probable cause to search the vehicle. During the search of the vehicle, the officer discovered two large bags in the truck. The officer asked GOMEZ what was in the bags and was informed by GOMEZ that there were clothes in the bags. The officer proceeded to lift one of the bags and noticed that it was heavy and asked GOMEZ why the bag was so heavy if it only contained clothes. GOMEZ indicated that he had money inside the bags. Moments later, GOMEZ and the bags of money were transported to a PRPD station.

At the station, a narcotics detection police canine unit alerted to the odor of narcotics on the money and during questioning GOMEZ indicated to agents that he obtained the money from his pawn shop business in Colombia and came to Puerto Rico in search of business opportunities. After the interview, GOMEZ was released, and agents seized $583,830.00. That evening, GOMEZ contacted a DEA UC agent and asked him/her to take him to the airport in San Juan, Puerto Rico. Agents believe GOMEZ feared he would be arrested by law enforcement and returned to Colombia. Forfeiture proceedings have not been challenged by GOMEZ and agents believe GOMEZ has not returned to the United States.

15. On August 28, 2010, DEA agents went to the Coral Beach Condominiums, Tower 1 to interview and verify that the address that GOMEZ provided for his residence to agents during the interview on August 12, 2010 was true. Agents met with leasing agents and building managers for the Coral Beach Apartments in Isla Verde, Puerto Rico and were informed that GOMEZ paid month to month for the apartment and abruptly moved out from apartment number 209 on or about August 12, 2010. Agents believe that GOMEZ immediately fled Puerto Rico to avoid further investigation by law enforcement after agents seized $583,830.00 from him on August 12, 2010. Shortly thereafter, the leasing agent escorted the agents to the vacant apartment and provided them with permission to search the apartment and everything inside of it. Agents discovered a black suitcase in the living room and while looking through the contents of the suitcase found several sheets of carbon paper and a rubber mat, similar to a door mat inside the liner of the suitcase. Based on training and experience, carbon sheets inside the liner of a suitcase in this manner are typically used by money couriers to conceal large amounts of currency, believing the carbon will conceal the currency from airport screening devices.

16. On or about September 2, 2010, GOMEZ negotiated a money laundering contract with UC1. During the negotiation, GOMEZ requested that UC1 wire transfer approximately $500,000.00 for GOMEZ. On September 7, 2010, FNU LNU, AKA MANUEL GABRIEL, an associate of GOMEZ, provided UC1 with two duffel bags with approximately $490,000.00. During the exchange of money UC1 requested that MANUEL GABRIEL ask his boss what his (boss) price would be for "televisores" (understood to be code for kilogram units of cocaine). MANUEL GABRIEL indicated he would ask his boss, indicating to agents that he was involved in cocaine sales and that the currency exchanged during the meeting was narcotic proceeds.

17. Between September 3 and September 8, 2010, GOMEZ sent a series of e-mails containing wire transfer instructions to a UC1. On September 8, 2010, agents from the MLG wire transferred $99,850.00 to account number 157734781, in HSBC Bank, beneficiary of New City, INC.

18. In March, 2011, a judicially authorized Search and Seizure Warrant was issued on HSBC account number 157734781, and $99,850.00 USC was seized from this account.

Your affiant, being duly sworn, states that the facts contained in the foregoing affidavit are true to the best of the affiant's knowledge, information and belief.

_____
Jason Staab-Peters, Special Agent
Drug Enforcement Administration